Let's wait and just let everyone get settled first. Okay, Mr. Carlton. Morning, honors. Thank you for allowing Mr. Rahman to have his case presented by oral argument this morning. I represent, my name is Steve Carlton, attorney in Baton Rouge. I represent Mr. Omar Rahman, who was a trainee for Exxon Mobil Corporation, that we'll refer to as Exxon today, back in 2017 and was dismissed from his employment that summer. We believe that we have asserted the Title VII racial discrimination case against him, which we believe the judge wrongly dismissed via summary judgment pursuant to Rule 56, when there are fundamental questions submitted and shown by the circumstantial and direct evidence, which requires a trial of this particular matter. Now, Rule 56 has its place certainly in many cases, but this circuit court has found, in many cases, that it is improper for the district court to grant summary judgments when the standard is to look at race discrimination or sex or age discrimination cases in a light most favorable to the appellant employee. In fact, almost 20 years ago, it's hard to believe it's been that long now, in the Ratched v. Jackenbach case, Judge Clement noted that both circumstantial evidence and direct evidence should be looked at as to whether or not there should be a trial of an age discrimination case and reversed a district court's grant of summary judgment for not properly recognizing the disputed issues that existed. In this particular case, Mr. Rahman, a minority African-American, was part of a basic operator trainee class in 2017 at the main refinery of Exxon in Baton Rouge. The Exxon mobile refinery is the same refinery that has existed back from Huey Long's time, the standard oil refinery just north of the Capitol in Baton Rouge. But following his passage of the book training portion, along with several other candidates, including two other minorities, Mr. Rahman was the only minority, along with one white male, James LeBlanc, that was assigned to go to a different facility, still under the Exxon umbrella, but as you leave the refinery and you go north on Highway 61 towards St. Francisville, there is a separate facility that doesn't refine oil and gas. What it does is it produces plastic pellets, which are ultimately used in I am trying to understand why there is a dispute about how long that he got, the question of whether he had two weeks of training or two days of training. Why is that? Am I correct if that's in dispute? And I can't understand why that is in dispute. I mean, why wouldn't we know how long his training was? There are qualification cards in the record showing he received completely inadequate training compared to Mr. LeBlanc, and you can find those. Well, I understand that there's two forms for him and there's more for LeBlanc, but there seems to be a suggestion that sometimes people are just kind of like when you do your billable hours at the end of the week instead of every day. I'm not saying you should do that. I'm just saying sometimes people do. And so you just have one document for the week instead of five. Is that what happened here? Why can't we figure this out? What we see on these different in the distinction, which the trial court never actually looked at these qualifications cards because he wrongfully decided that the qualifications that there could be no racial discrimination, which related to his ultimate termination, even though the qualification cards and the field training, you either pass the field training and get the job or you don't and you're fired, you're let go. So the adverse employment action is inherently tied to this qualification process. And Mr. Roban testified, that's Exxon's area training supervisor, who is over this training process. He says that on these cards, James LeBlanc was trained over 15 days in 150 different subject matters for this final test. And it shows on the last three and a half pages where he initialed them along with his supervisor. Mr. Rahman had a different supervisor who indicated that those same 150 categories were supposedly trained to him in just the last two days. He just initials everything and checks them. Mr. Rahman refused to sign them because he and Mr. LeBlanc signed all of his training because it took over 15 days. The area supervisor for Exxon, Mr. Roban said, I asked him, how long would it take to reasonably train any applicant for this field operator position in those 150 categories? He said at least two weeks. So that means Mr. Crawford, Mr. Rahman's trainer, who says he did it in two days, either falsified that record or he gave him such short shrift inadequate training that he was bound to fail the final walkthrough test. And the reason I mentioned the polyolefins unit being different from the main refinery is because this isn't just the case, perhaps, of a bad trainer for Mr. Rahman and a good trainer for Mr. LeBlanc that's racially neutral. We've got 28 shift operators and their supervisors at this time in 2017 that are all white males, every single one of them. And so this trip back to the training, because I guess what you're saying is the district court's error was in determining that training is not an ultimate employment decision. But your argument is because you can't get from A to B without the training and B is keeping your job, it is an ultimate employment decision, whereas in other worlds, it might not be. Yes, ma'am. In fact, if my job, they won't train me on my new computer. I still keep my job. It might be irritating, but it's not an ultimate employment decision, right? He is trained to be a is the BRPO, which is the Baton Rouge Polyolefins Plant, outside operator qualification card. So if you don't get adequately trained and are passed in the final field walkthrough in all of these qualifications, then you don't get... And this is the only place you can get trained, right? It's not... Yes, ma'am. Absolutely. Absolutely. He has to be field trained. He has to go around with his trainer, understand all these various equipments so that he can pass the final field walkthrough. And so he was not given that adequate training. And then you have to... What is the inference from that, as Judge Clements said, is available in the circumstantial evidence context? What is the inference of that in a case where every single shift operator on all three shifts, they have three separate shifts, eight hours a day, this plant goes 24-7, every single position is white male in 2017, which is, you know, our expert witness on statistics says that that is completely improbable. It's highly probable as evidence of both racial and gender discrimination. The trial court, instead of giving that the light most favorable to Mr. Rahman, disputes that and basically says, I'm not going to look at anything except Mr. Rahman versus Mr. LeBlanc, and then I'm not going to look at the training cards because under the McCoy decision, which doesn't even deal with adverse employment actions and training, says I don't have to. So we move for reconsideration just as a matter of the law of this circuit. There's Shackelford and many other cases that say when the training relates to an adverse employment action like termination or failure to promote. Basically, you're setting Mr. Rahman up to fail. And we don't know, I mean, that's for the jury as a fact finder to say, was Mr. Crawford just a poor trainer or was he setting him up to fail because in this particular area of the plant, we just employ white males in this shift, this field operator position. And this, of course, is compounded by the fact that the final walkthrough is purely subjective. There is no scorecard. There is no standard 70, 80, 90 percent that the applicant has to pass. And this court has said, excuse me, there's a judge asking you a question. I'm sorry. I'm concerned about whether Mr. LeBlanc was an adequate comparator. Yes, ma'am. Let's go back to when the bot tests were taken. Yes. Mr. LeBlanc's performance on the bot test, what was it? How many did he fail? How many tests within the basic operator training? He did better on basic operator training than Mr. Rahman did, but they both passed the standards set by Exxon for graduation from the basic operator training. Right, but before that, did he finish second to last or first? I'm not sure where Mr. LeBlanc finished, but he did better than Mr. Rahman. I do know that. Mr. Rahman was toward the bottom of the class, but he passed by Exxon's own standards. When we talk about similarly situated employees, though, Judge, we're basically saying these two men of the same basic operator training class were the only two sent to the field in this particular area, this polypropylene unit, and they're both trying to take the field training for the exact same position, which is the field operator. He had already done so poorly on the bot training. If I was looking at, regardless of race, I'm looking at this guy who finished, kept failing things, finished at the bottom of the class, and Mr. LeBlanc, who did better. I don't think I would spend maybe three weeks training a guy who didn't look so good compared to the guy who had a better potential. Why wouldn't that be allowed to sort of discontinue the training and say, look, you're not going to make it? Well, it's just like anything in life, Judge. If you graduate from LSU and you're at the middle or the bottom of the class and you go to law school, they don't say, well, you're never going to make it because you did so poorly at the last level. That's really not an adequate comparison. Okay. Well, it is true that Exxon sets the standard for what is pass-fail, and if he wasn't sufficiently an appropriate trainee to pass, the fact that he was one of the last that passed, he still passed, and that's at least an objective. But they could have stopped him at that point, but they sent him on to the training, so your argument is he should have been fully trained. Yeah, absolutely. And if he was fully trained and then failed, then that's a different matter. That standard, the standard in the basic operator training class is a gatekeeper. If you can't pass that program, whether first or last, you don't go on. But if you pass, you do. So, yes, he was toward the bottom, but he was still, by Exxon's own admission and standards, he was passed, sufficient to go to the field according to Exxon. Okay. This is not Mr. Rahman's standard. This is Exxon's standard, and he passed that standard. Yes, toward the bottom, but he still passed. And when he gets to the field, certainly it is a factual question as to whether or not his training was racially motivated. That's certainly, but it's not a summary judgment. That's for sure. You're saying the jury could just believe that while it was just a, it was just no, not worthwhile, kind of the point that Judge Clement is making, but your argument is there's at least a fact question as to whether he took a look at this guy and discriminated on his race. Right. Well, the qualification cards, which Exxon undisputedly admits are what they are, but they never speak of them in their brief, clearly shows that he did not receive the same level of attention and training that Mr. LeBlanc did. Mr. LeBlanc's trainer spent 15 days going over this very same set of equipments that Mr. Crawford, Mr. Rahman's trainer, my client, supposedly did in two. And the area supervisor says you can't do it. There's no way he did that in two days. In other words, Exxon's own person in charge of the trainers says Mr. Crawford could not have possibly trained him in all those categories in two days. That means he either did a bad job or didn't do the job at all. And then we're back to is there a racial inference that the jury could find that goes with that to at least get past the summary judgment phase? We say absolutely yes. When you look at the backdrop, which we can't take this case in a vacuum, we're talking about an area where he's attempting to qualify as a field operator where there are no minorities. There are no women. There are no Hispanics. There are no Asians. Twenty-eight different positions, all white male. It's like an anachronistic throwback to an earlier era. And Exxon points out that, well, after this EEOC complaint and this lawsuit, now they're doing better. But that's not the standard for this case. This summary judgment should be reversed and at least a jury trial on was this inadequate training, racially motivated, given their racial composition. And why in the world, if this is such an important position, why does Exxon have a subjective standard? Because the Fifth Circuit has previously said subjective standards of white male supervisors on promotion or termination decisions are ripe for discrimination. Your initial time has expired, Mr. Carlson. Thank you. Good morning, Your Honors. Scott Huffstetler on behalf of the Appellee Exxon Mobil Corporation. And I'm going to jump straight to the qualification cards since that seemed to be what you were interested in on the initial argument. But before I do that, I need to correct sort of an error, not sort of, an error in the that I think will help clear up the issue with the cue cards. This isn't the area in which the training occurred isn't a separate facility. Rather, what occurred in 2017 and what occurs every year at Exxon Mobil is that in Baton Rouge, Exxon Mobil has a refinery, a chem plant, a plastics plant, a polyolefins plant, and a lubes plant. This case involves the polyolefins plant. Every year, because of the safety sensitive nature of the operator position, we have an operator trainee class. And so in 2017 for the polyolefins plant, so one of those five plants, we brought in ten operators as part of the trainee class. What they first do and what you were talking about, Judge Clement, is they go through the basic operator training. That's from February of 2017 until April of 2017. It's general classroom training, just teaching you the basics of operations. After that, they go to what is called field specific training. There are three areas within the polyolefins plant where you can be trained in field specific training. There's the polypropylene area, the densification area, and the polyethylene area. And so where Mr. Roman went was the polypropylene area. So he was in this overall operations class for the polyolefins plant, which consisted of five white employees, four African American employees, and one Hispanic employee. Now when everything broke off, there were some African American employees that went to the polyethylene area, some that went to the densification area, and then Mr. Roman, who's African American, and Mr. LeBlanc, who's white, they went to the polypropylene area. So that's sort of the background. We're not talking about a whole separate plant. We're within this unit of the polyolefins plant. Now I want to explain to you, Judge Haynes, why it's disingenuous to take the position that he was only trained over two days because that's what it says over the qualification card. Once you finish the basic operator training, which lasts from February to April, you enter what's called the field specific training. And that occurs from April to July. And in July, you have to take a final walkthrough test, which basically certifies that you can independently, safely, and competently run the unit that you're going to be an operator on, which, and that's regulated by OSHA because of the safety sensitive area. But this training, there's no way it would have occurred over two days. And the record evidence shows that. Mr. Roman testified in his deposition that he went through the training from April to July. The declaration of Michael DiRisotto, which is, that's at page 97, 92 in the record, it has all sorts of attachments to it of his notes and emails that came in from first line supervisors and peers, all of which were admitted into evidence in the record and show that day in, day out, between April of 2017 and July of 2017, that Mr. Roman was being checked. He was being trained on this polypropylene unit. The argument is that there's these hundred and fifty things that were done in two days instead of two weeks. What is your response to that? So the response to that is, is that the record evidence is that there was testimony that you do have these modules and the way that the cue cards, the way the cue cards are set up is, is that the operator and the trainee and the trainer who is a, who is a, is not a supervisor, it's a peer operator that's training you, that they're supposed to go over each of these and initial them and date them on the date. And what the testimony was, was that technically they are supposed to do it the way that Mr. Carlton is stating, that as you do it, you're supposed to sign it and date it. But in practice, what occurs is, is kind of like you said about the billable hours, Judge Haynes, and I had to laugh about that a little because I'm guilty of it sometimes, but that they, they do, they get to the end and they stockpile and the, and, and they put it all on one. And that's apparently what must have happened. What about the deposition testimony he referenced? That, that, that was the deposition testimony of Jude Roban, but Derek Rechard, who was the first line supervisor, he testified that this is the way that it's done in practice. And I think the... Why isn't that a fact issue? I mean... I'll tell you why it's not a fact issue. Yeah. The reason it's not a... Very confusing. And when something's very confusing, that usually is a fact issue. The reason it's not a fact issue is because we put in the cue cards of all 10 operator trainees. And if you look at the qualification cards for the other operator trainees, three white employees, their qualification cards by their, their trainers were filled out the exact same way. You have Patrick Green, and that's at page 10865 of the record. In different areas, right? LeBlanc had a full two weeks. Correct. Okay. So these people were in other areas that had maybe something that looks similar. But I'm just saying that the two guys that were doing the same thing, Roman and LeBlanc, have very different cards. Now, I understand it could be the billable hour thing, but I'm just thinking, why isn't that something for the jury to decide? I'll tell you, the reason it's not is because it doesn't show, it doesn't create an issue of fact on the plaintiff's ultimate burden at summary judgment of proving discrimination. It doesn't go to the falsity of the legitimate non-discriminatory reason. Okay, well, let's get to that then, because I agree that in a lot of situations, training is not itself an ultimate employment decision. But where the only way I can get from here to the door is to be trained, then I got to have that training or I won't get out the door. So that's a little bit different than ordinarily, like, as I was saying, if I get a new computer on my desk, but, and we have wonderful IT people, but let's pretend for the moment that they're not, and they refuse to train me, I don't lose my job over that. So while it might be very unpleasant, it doesn't affect my job. But where I cannot keep my job unless I can use that computer, I have to be trained on it, right? Understood, but where it comes in here, first off, I can tell you that the law, it's very settled in the Fifth Circuit that inadequate or denied training is not an adverse employment. But we have cases that say what may not ordinarily be an adverse employment decision can be if it directly impacts the ultimate employment decision. That's the problem here, is I see this as a little different than just the ordinary doodly-doo that happens in so many cases where you say, well, that's not an ultimate employment decision. It's, well, first of all, I would say that there is not, there's not a Fifth Circuit case that's cited in the briefing for the prospect that inadequate training is an ultimate employment decision. And in fact, when I go over the cases in preparation for this, that there is, everyone who has sat, who is sitting on this panel today has participated in a decision where it was found that a training issue was not an ultimate employment decision. But did the person get fired because of their lack of training? Not, not in, not in those cases. But that's the problem. I mean, again, if it's something you could get elsewhere, if I have to learn French to get this job and you all won't train me on the French, but I could go down the street and learn French, maybe that wouldn't be enough. But if it's some language that only you speak, how else can I get the training? But the reason that doesn't get us to a fact issue is, is that the bad actor in the trainer, the termination decision was made by the operations manager and also made by the, recommended by the second line supervisor who, he based his decision on the evaluations in the final walkthrough of three first line supervisors. None of those folks who were involved in the decision had any input into the training. And then you're back to the problem, which is, okay, I don't know French. I'm not going to pretend I do, but that's because I didn't get the training. So he's not denying that ultimately that he never got out that door, but he's saying it's because you didn't walk him down there with this training. So that's the hard part, is how are we, you're saying that companies can discriminate on that, they can require the training, they can make it so without that training, you can't get the job, but then they can treat people of one race differently than another on that? Well, what I'm saying is, is that there's no, first off, I'm saying that as, as a matter of law, under current Fifth Circuit jurisprudence, that inadequate training is not an adverse. Okay, so if Exxon made the rule, we will not fully train people of color. There's nothing anybody can do about that. That's just fine. Under, I can tell you under, I want to get to a step beyond that, but I can tell you that as I, as I appreciate current Fifth Circuit jurisprudence, inadequate or denied training is not an adverse employment action. Even in this situation where it costs. Even, even in this, even in this situation. Even if they did it based on race. Well, I, you know, I, I, there's no evidence of that here, but I think that the issue you're concerned about is addressed through the termination claim, which is actionable. And you, you do go to the termination piece of this, and you do go through the traditional McDonnell, Douglas, and Rasheed burden shifting there. So your concern about whether or not there was any sort of discrimination at the training stage, that is addressed through doing the McDonnell, Douglas, and Rasheed burden shifting analysis at the termination piece, which passes the muster. So, and, but, but to get onto the, the second part of, of the concern though is there is no evidence of discrimination on this particular denied. Walk me through that. Okay, and I'll, I'll. I'll make a better argument than saying yes, Exxon can discriminate on this. Okay, the, the, the, the, the argument on that then is, is that when you look at the prima facie burden, assuming that inadequate training is an actionable adverse employment action, when you look at the prima facie burden on the, whether or not folks outside of the protected class were treated more favorably or, and they were similarly situated to Judge Clement's point, Mr. LeBlanc is not similarly situated to Mr. Ramon. He had a different trainer, first off. I mean, he, he had Mr. Seguin and Mr. LeBlanc had Mr. Crawford, but beyond that. But wouldn't that be the discrimination that the white person got the better trainer than the person of color? Not in this case, because when Mr. LeBlanc was deposed, he testified that Mr. Seguin was on vacation for much of his training and that Mr. Crawford actually did a lot of his training. And that's, that's in the, that's in the record. But he got the full two weeks. What's that? He got the full two weeks. They, they both got from April until, until, until July. The dispute is whether those 150 points were in fact taught in two weeks or in two days. But that, that is actually not in dispute because Mr. Ramon himself testifies that he went through the field training period where he received input, not only because remember for the training, and this is in the record, not only do you shadow your trainer, but you work with an area trainer. You receive help from your peers. You receive help from first line supervisors, both Mr. LeBlanc and Mr. Ramon. They came to this unit every day from April until July and worked on the unit. So it's not just about that, about that, that qualification card. It's about the experience that they received working in that unit every day. It's about at the commencement of the field training, the record evidence shows that they both received the same materials. What was it that Mr. Ramon refused to sign? He refused to sign the qualification card because his own testimony was that he didn't, his, his belief, and it was a subjective and self-serving belief, which everyone on this panel knows is not admissible for summary judgment purposes, but his belief was that he had not been adequately trained. But the record evidence, which is undisputed, shows that he was trained during that time period and that he had all the written materials. He took all the WebCat modules that you have to take, which incidentally, this is another reason Mr. LeBlanc isn't a, a comparator because Mr. LeBlanc did better than him on the WebCat modules. And so, and in fact, what is really shown when you get to the heart of the inadequate training is not only was there no disparate treatment, but Mr. Ramon was actually treated better. They saw, and this is indicated in the DeRisotto notes, they saw that Mr. Ramon was struggling and in response to that, they gave him more time. They, they, they gave him more, they, they told him, well, look, if you're not working well with your trainer, go hang out with your peers a little bit and see if they can't walk you through the process a bit. And then he gets to the end and he hasn't finished his WebCat modules and they said, you know what, we're going to let you work overtime and we're going to pay you overtime so that you can come in and you can gain more experience and, and work towards that. Then when it comes time to schedule the final walkthroughs, which you have to pass the final walkthrough in order to qualify and not be terminated, they said, you know what we're going to do? We're going to put Mr. Ramon last so that he, so, so that everyone else, all the, all the other nine operators take their tests first and he goes last. And then when he fails the first final walkthrough that was scheduled last for him, even though the other three African American operator trainees passed, even though the Hispanic operator trainee passed, rather than terminating him at that point, they said, you know what we're going to do? We're going to give you another two weeks to study and give it another shot so that you can have another shot. And it was only after he failed the final walkthrough a second time after being given that prefer, not disparate treatment, preferential treatment that they ultimately made the difficult decision to terminate his employment. The only evidence of pretext that's really being offered in this case is statistics. And this court has said time in and time out that in an individual disparate treatment case that statistical evidence is going to rarely suffice to rebut an employer's legitimate non-discriminatory rationale for a decision. In fact, in the Roka case, which is the 245 Fed Third 790, we said, the court said statistical evidence of a general underrepresentation adds little to a disparate treatment case. So all of this statistical arguments about underrepresentation in one unit of an overall plant, that doesn't create an issue of material fact either. But it also, a lot of the statistics that are offered are misleading. I mean, they're just simply not true. The expert said that every single African American operator trainee that was hired in 2017 was terminated. That isn't true. The record evidence shows that the three other African American operator trainees that were hired by ExxonMobil for the polyolefins plant in 2017, they qualified. It was only Mr. Roman who didn't qualify. Let me ask you before you run out of time. Yes. Confirm that the allegation that Mr. Roman only got two days of training is incorrect and false. It's incorrect and it's not supported by the record evidence. Even by Mr. Roman's own testimony, if you look at his deposition, he will say that he trained on that unit from April of 2017 to July of 2017. The only thing that is in the record that supports that argument is that qualification card which shows the dates of July 14th and July 15th of 2017. And if you look at the other qualification cards for the nine other operator trainees, that was done with three other white operator trainees, which shows that not only is that argument not supported there, but when you look at Roman's testimony, the supervisor's testimony, it's very clear that Mr. Roman was training the whole time. On those 150? On those 150. That's also through the WebCat modules, too. He had to take WebCat tests throughout. I also want to point out, because we haven't touched on it, that procedurally, this was raised for the first time on a motion to reconsider. That standard of review is abuse of discretion. Well, not if the district court addressed it in the original, so it's kind of hard to say it was raised for the first time on a motion for reconsideration. It was waived in office. Well, not if the district court decides it. Excuse me? Not if the district court decides it. How can we say that's waived? Well, I understand. Thank you all for your time and engagement this morning. Thank you, Mr. Carlson. You've saved some time for rebuttal. Yes, Your Honors. Thank you again. This was an insular system. This PP unit was separate from these other units, so the other trainees, other than Mr. LeBlanc and Mr. Rahman, were not subject to the same standard of training, because this was all about... Let's talk about the two days. He said there are three months training, and he admitted that. He did not. He did not admit that. He said he did not receive adequate training. That was his complaint all along. He did not sign the qualification. I understand, but what was he doing for the three months if it wasn't these 150 points? He was shadowing the actual field operations crews. He was assigned to them and trying to learn the system. Mr. Crawford was simply another employee of Exxon as a shift operator who took on this additional duties to train him. What was he not being shown? He was not being shown these variety of equipments that are on the last three and a half pages. He's just walking around, walking around, walking around? No, he's doing... Only on the last two days was he shown anything? He's doing whatever the crew is doing, because that is the only thing that's available to him. This was not Mr. Rahman's assessment that he was trained only on those last two days. That's signed by Mr. Crawford. That is at least... Everything you've gone through with Exxon's counsel has been disputed issues of fact against their own witnesses. Mr. Crawford, who is now deceased, attested in this document that he gave him all this training in the last two days, which Mr. Roban admitted in his deposition was simply fraudulent, could not have been done, and yet he never challenged that Mr. Crawford gave him that testing on any other dates, that this was some kind of catch-up, dating of the system. He never said that. What did Rahman say about that? Mr. Rahman said, I didn't check those categories because I wasn't trained, and I complained that I was not fully trained, and when I said I wasn't qualified, it was under these circumstances where they weren't training me. I went out with the crews. I did what the crews did, but there was a lot of the equipment that I was never trained on, and Exxon's own qualification card backs that up. You're basically saying this closing argument we heard from your opposing counsel is his of the fact, and your facts are different, and so the fact that we might find his closing argument more persuasive if we were the jury is not our issue here. Right. He talked about proving a racial discrimination case. This is summary judgment. This is just looking at the evidence in a light most favorable to Mr. Rahman. There certainly is issues of fact here as to his training and as to the general composition of this PP unit, which— How do you respond to the fact that there were three other African Americans who all made it through, albeit somewhere else in this whole— Right, because they had different training. They had different supervisors, and their decision to terminate was not based outside this polypropylene unit where you have the same white males who are doing this shift operations job, supposedly training both men, women, and minorities, and when they have subjective standards, they have no grading system, and they say you failed, no wonder all 28 positions are white males. The Fifth Circuit said in the Anderson v. Douglas case, 206 F. 2nd. 1277, a long time ago, that promotion systems are termination systems based on subjective evaluations of all white male supervisors can be evidence of discrimination in disparate treatment cases because when you have the same club that doesn't want a new member of a different race or sex making all the decisions, that's why these qualification cards, combined with the overall composition of this workforce in 2017 of fully white male, takes on a greater significance. If there was no backdrop of this particular area being all white and all male, perhaps there would be less importance to be put on that. But it is certainly a trial issue, a factual dispute as to what was the training, what was the scope of it, and did they set this man up to fail, or did he simply not learn the material? But when you have their own trainer saying I trained him on all these steps in two days, and another Exxon supervisor saying ain't no way he did that, then you've got to wonder are they setting him up to fail or not? And there's no question that an adverse employment action, everyone, Exxon and Ms. Rahman has always said, if you don't pass this final field walkthrough, you lose your job. So the training is directly related to whether you get the job or not. It is something the Fifth Circuit has said since Shackelford and many cases in the district court level that inadequate or improper training can be a basis for racial discrimination. All right, your time is up. Yep. All right now. You got it. Thanks so much. These cases are under submission. The court is in recess until 9 o'clock tomorrow.